**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RICHARD INZA, *et al.*,<br>*Plaintiffs*,<br>v.<br>AT&T INC., *et al.*,<br>*Defendants.* | Civil Action No. 24-cv-3054 (RDM) |

**MEMORANDUM OPINION AND ORDER**

Richard Inza, Michael Inza, and Ray Leon ("Individual Plaintiffs") and VoIP-Pal.com, Inc., bring this putative class action on behalf of "approximately 373 million U.S. mobile subscribers" who were allegedly overbilled and misled by Verizon Wireless, AT&T, and T-Mobile ("Carrier Defendants") and their officers and directors ("Individual Defendants"). Dkt. 10-4 at 10, 48–53 (2d Am. Compl. ¶¶1, 102–18). In a complaint spanning 221 pages and 686 paragraphs, Plaintiffs allege a far-reaching (and at times inscrutable) conspiracy based on Defendants' practice of bundling cellular service with Wi-Fi calling, a wireless voice service that relies on Wi-Fi to route calls over broadband internet networks instead of via cell towers. *E.g.*, *id.* at 11, 34–36 (2d Am. Compl. ¶¶ 2, 65–67). Each Defendant offers Wi-Fi calling for "free" or at "no additional charge" with the purchase of certain cellular plans. *Id.* at 26, 63–67 (2d Am. Compl. ¶¶ 35, 152–60). None of the Defendants offer a standalone Wi-Fi calling service that does not require the purchase of a qualifying cellular plan. *Id.* at 18, 40–41 (2d Am. Compl. ¶¶ 3, 76, 80).

Plaintiffs allege that these bundling arrangements are the centerpiece of the Carriers' conspiracy to "monopolize[] the Wi-Fi calling market." *Id.* at 22 (2d Am. Compl. ¶¶ 25–26).

Had the Carriers "offered standalone Wi-Fi calling," Plaintiffs allege, "they would have immediately created a competitive environment." *Id.* at 44 (2d Am. Compl. ¶ 87). Instead, Defendants allegedly "conditioned" the market "to believe [that] Wi-Fi calling was already 'free' and only available [] in a cellular calling bundle," thereby suppressing the development of competitive alternatives. *Id.* at 41–42, 44 (2d Am. Compl. ¶¶ 81, 87). In addition, Plaintiffs allege that marketing Wi-Fi calling as "no charge" is misleading because it conceals the requirement that consumers purchase a cellular plan to access Wi-Fi calling, *id.* at 20 (2d Am. Compl. ¶¶ 19–20), and Wi-Fi calling's reliance on "private, subscriber-funded infrastructure"—i.e., a Wi-Fi connection—rather than Defendants' cell towers, *id.* at 22, 39 (2d Am. Compl. ¶¶ 25, 74–75). Based on these allegations and many others, Plaintiffs assert 14 claims, including four claims under the Sherman Act, four claims under the Clayton Act, four claims under the Racketeer Influenced and Corrupt Organizations Act, one claim under the Telecommunications Act, and one claim seeking the imposition of an equitable lien and constructive trust. *Id.* at 181–204 (2d Am. Compl. ¶¶ 537–624).

Amid this sea of allegations and claims, Plaintiffs acknowledge that each of the Carriers' subscriber contracts includes an arbitration clause. *Id.* at 164 (2d Am. Compl. ¶ 476). Defendants have moved to enforce those arbitration clauses under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*, and to stay the Individual Plaintiffs' claims pending arbitration. *See* Dkt. 70. Defendants also ask the Court to stay or dismiss VoIP-Pal's claims based on the rule against claim-splitting. *Id.* at 43. For the following reasons, the Court will **GRANT** Defendants' motion to compel arbitration, will stay Leon's, R. Inza's, and M. Inza's claims pending arbitration, and will dismiss VoIP-Pal from this suit.

## I. BACKGROUND

In support of their motion to compel arbitration, Defendants offer sworn declarations and other exhibits showing that each Individual Plaintiff entered into a subscriber agreement containing an arbitration clause with at least one of the Carriers. Dkt. 70 (Exs. 1–37). Defendants also argue that principles of equitable estoppel allow each Defendant to enforce the arbitration clause of the other Defendants. Dkt. 70 at 34–37. Plaintiffs have neither disputed any of Defendants' factual allegations nor introduced any controverting evidence of their own. *See* Dkt. 87-1 at 4. The Court, accordingly, relies on the following undisputed facts for purposes of resolving the pending motion.

### A. AT&T

According to the declaration of Paula Phillips, a Director in the Legal Department of AT&T Services, Inc., "[t]o place a new order for AT&T wireless products or services, or to upgrade existing products or services, a customer must accept AT&T's terms of service." Dkt. 70-1 at 1 (Phillips Decl. ¶¶ 1–2). Plaintiff Ray Leon has been an AT&T wireless customer since May 2013. *Id.* (Phillips Decl. ¶ 4). To become an AT&T subscriber, Leon "accepted AT&T's Wireless Customer Agreement and acknowledged that he had received the terms of the agreement, 'including [the] limitation of liability and arbitration provisions.'" *Id.* Between May 2013 and 2021, Leon acknowledged and acceded to the same agreement on six different occasions. *Id.*; *see* Dkt. 70-2 (AT&T record of signatures captured during each transaction). In 2019 and 2022, Leon entered into additional device sale contracts with AT&T and, both times, acknowledged that he had read AT&T's terms, which "include[d] dispute resolution by binding individual arbitration instead of jury trials or class actions." Dkt. 70-1 at 2 (Phillips Decl. ¶¶ 5–6); *see* Dkt. 70-3; Dkt. 70-4.

On December 1, 2022, AT&T "consolidated and streamlined the separate contracts for consumer offerings into a single contract, the Consumer Service Agreement ('CSA'), that applies to all customers with wireless services." Dkt. 70-1 at 2 (Phillips Decl. ¶ 7). Like other AT&T subscribers, Leon received notice of the new CSA in his October and November billing statements. *Id.* at 3 (Phillips Decl. ¶ 8). Both billing statements explained that "[e]ffective 12/1/22, we have updated the AT&T Consumer Service Agreement" with, among other things, "new ways to resolve individual disputes informally and procedures for certain coordinated arbitrations." Dkt. 70-5 at 9; Dkt. 70-6 at 7. They further explained that the subscriber would "accept and agree to be bound by the updates" if they "continu[ed] to use [AT&T] services." Dkt. 70-5 at 9; Dkt. 70-6 at 7. Leon continued to use AT&T services after the updated CSA became effective, and he did not submit a written notice to AT&T rejecting the updated terms. Dkt. 70-1 at 3 (Phillips Decl. ¶¶ 9–10).

The top of the CSA included the following legend in boldface print: "**Please read this Agreement carefully. It requires you and AT&T to resolve disputes through arbitration on an individual basis rather than jury trials or class actions.**" Dkt. 70-8 at 2. Section 1.3 of the CSA, which begins near the top of the second page of the agreement, "outlines how disputes between [subscribers] and AT&T will be resolved through [AT&T's] informal dispute resolution process, individual arbitration, or small claims court." *Id.* at 3. It then explains how arbitration works and that the "arbitrator's decision is legally binding, and . . . subject to very limited review by courts." *Id.* The CSA goes on to state:

> **You and AT&T agree that arbitration will take place on an individual basis. Class arbitrations, class actions, and representative actions are not permitted. This means that you and AT&T will neither file a lawsuit (in any court other than a small claims court), nor pursue or participate in an action seeking relief on behalf of others.**

*Id.* Regarding the scope of the arbitration clause, Section 1.3.2.1. states that "[t]o the greatest extent permitted by law," the parties "agree to arbitrate all disputes and claims . . . except for claims arising from bodily injury or death." *Id.* It also reiterates that "**[b]y entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action**" and confirms that "this arbitration provision will survive termination of this Agreement." *Id.*

**B. T-Mobile**

T-Mobile relies on a declaration executed by Judy Sanchez, whose job responsibilities at T-Mobile include "review, analysis, and research of litigation and arbitration matters, and acting as a custodian of T-Mobile's records." Dkt. 70-9 at 1 (Sanchez Decl. ¶ 2). Sanchez attests that Plaintiff Michael Inza ("M. Inza") has had a T-Mobile account since April 30, 2016. *Id.* at 2 (Sanchez Decl. ¶ 4). When M. Inza activated his account, he had to agree to T-Mobile's Terms and Conditions, which contained a mandatory arbitration provision and a class action waiver. *Id.* at 2 (Sanchez Decl. ¶ 5); *see* Dkt. 70-10 at 3, 9–10. Since 2016, M. Inza "has repeatedly been presented with and agreed to T-Mobile's [Terms & Conditions] by using and paying for T-Mobile services and/or devices." Dkt. 70-9 at 2 (Sanchez Decl. ¶¶ 6, 16–28).

Most recently, M. Inza "was presented with and accepted the May 15, 2023 [Terms & Conditions] when he received a new phone pursuant to an equipment installment plan [] dated September 18, 2023." *Id.* at 4 (Sanchez Decl. ¶ 19). When the new phone was delivered, it would have come in a box with a sticker informing M. Inza that "[b]y purchasing or opening this package, activating, using or paying for service, you agree to the applicable **Terms & Conditions ("T&Cs") (including mandatory arbitration provisions)**" and directing him to T-Mobile's website where the terms and conditions were available. *Id.* M. Inza "would have needed to break or remove [the sticker] to open the box." *Id.*

The first page of the May 15, 2023, Terms and Conditions states that it "contain[s] important information about your relationship with us, including individual mandatory binding arbitration of disputes between us, instead of class actions or jury trials." Dkt. 70-18 at 2. In a subsection titled "Dispute Resolution" beginning on page 5, the following paragraph appears:

> **YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL CLAIMS OR DISPUTES, OF ANY NATURE, INCLUDING TORT AND STATUTORY CLAIMS, IN ANY WAY RELATED TO OR CONCERING THE AGREEMENT, OUR PRIVACY NOTICE, PRIVACY OR DATA SECURITY PRACTICES, OUR SERVICES, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES, WILL BE RESOLVED BY INDIVIDUAL BINDING ARBITRATION OR IN SMALL CLAIMS COURT. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED.**

Dkt. 70-18 at 6. Three paragraphs later, the Terms and Conditions inform subscribers that

> **YOU MAY CHOOSE TO PURSUE YOUR CLAIM IN COURT AND NOT BY ARBITRATION IF YOU OPT OUT OF THESE ARBITRATION PROCEDURES WITHIN 30 DAYS FROM THE EARLIER OF THE DATE YOU PURCHASED A PRODUCT OR DEVICE FROM US OR THE DATE YOU ACTIVATED A NEW LINE OF SERVICE . . . .**

*Id.* The terms and conditions also contain the following class action waiver:

> **YOU AND WE EACH AGREE THAT ANY PROCEEDINGS, WHETHER IN ARBITRATION OR COURT, WILL BE CONDUCTED ONLY ON AN INDIVIDUAL BASIS AND NOT AS A CLASS, REPRESENTATIVE, MASS, OR CONSOLIDATED ACTION. If you opt out of the arbitration provision as specified above, this Class Action Waiver provision will not apply to you.**

*Id.* at 8. T-Mobile's records do not reflect that T-Mobile ever received an opt-out notice from M. Inza. Dkt. 70-9 at 5 (Sanchez Decl. ¶ 29).

## C. Verizon Wireless

Verizon Wireless relies on the declaration of Joseph Ninete, a "Senior Analyst" who "assist[s] with the handling of consumer disputes for Verizon Wireless." Dkt. 70-26 at 1 (Ninete

Decl. ¶ 1). Ninete attests that "Plaintiff Richard Inza has been a customer of Verizon Wireless since in or around September 2016." *Id.* at 3 (Ninete Decl. ¶ 8). On October 2, 2016, Verizon sent Richard Inza ("R. Inza") "a letter confirming his service activation which included a copy of the then-operative customer agreement." *Id.* (Ninete Decl. ¶ 9). The agreement set out the ways that a subscriber could accept the agreement, one of which is by "[a]ctivating your Service." Dkt. 70-31 at 4.

In August 2018, R. Inza "purchased a Samsung Galaxy S9 and executed . . . a Device Payment Agreement." Dkt. 70-26 at 3 (Ninete Decl. ¶ 10). The agreement required R. Inza to "AGREE TO AND MAINTAIN SERVICE WITH VERIZON WIRELESS UNDER YOUR CUSTOMER AGREEMENT," which it incorporated by reference. Dkt. 70-32 at 3. Concerning dispute resolution it provided:

> ADDITIONALLY, ANY DISPUTES UNDER THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ANY DISPUTES AGAINST THE SELLER AND/OR VERIZON WIRELESS) SHALL BE RESOLVED IN ACCORDANCE WITH THE DISPUTE RESOLUTION PROVISIONS IN YOUR CUSTOMER AGREEMENT UNDER THE HEADING: HOW DO I RESOLVE DISPUTES WITH VERIZON WIRELESS, WHICH TERMS ARE INCOPRORATED BY REFERENCE. SPECIFICALLY, YOU AND VERIZON WIRELESS (AND/OR THE SELLER) AGREE TO RESOLVE ALL DISPUTES UNDER THIS AGREEMENT ONLY BY ARBITRATION OR SMALL CLAIMS COURT AND YOU WAIVE ANY RIGHT TO A JUDGE OR JURY IN ANY ARBITRATION

Dkt. 70-32 at 3. In 2021 and 2023, R. Inza "purchased new devices and executed additional Device Payment Agreements," which also incorporated by reference the customer agreement and contained materially identical descriptions of the arbitration requirement. Dkt. 70-26 at 4 (Ninete Decl. ¶ 11); Dkt. 70-33 at 3; Dkt. 70-34 at 3.

Plaintiff Leon is also a Verizon Wireless subscriber. Dkt. 70-26 at 2 (Ninete Decl. ¶ 5). On April 4, 2025, Leon "purchased a new iPhone 16 and activated Verizon's Unlimited Plus

Service." *Id.* "In connection with this purchase, Leon electronically signed a receipt stating that he had read and agreed to the Verizon Customer Agreement, including the settlement of disputes by arbitration." *Id.*; *see* Dkt. 70-28 at 4. The agreement included a link to the full Customer Agreement. Dkt. 70-28 at 4.

The currently operative customer agreement went into effect on February 5, 2025. Dkt. 70-26 at 4 (Ninete Decl. ¶ 14). R. Inza was "notified of the update in the billing statement for his account for the period between January 29 and February 28, 2025." *Id.* Both R. Inza and Leon have used their Verizon Wireless services since the operative customer agreement went into effect on February 5, 2025. Dkt. 70-26 at 2, 4 (Ninete Decl. ¶¶ 5, 13).

The first paragraph of the agreement highlights that it contains "important information" about subscribers' wireless service, including "**how any disputes between us must be resolved in arbitration or small claims court.**" Dkt. 70-27 at 2. The full text of the arbitration clause has a grey background distinct from the majority of the agreement. *Id.* at 6. It provides: "YOU AND VERIZON BOTH AGREE TO RESOLVE DISPUTES ONLY BY ARBITRATION OR IN SMALL CLAIMS COURT AS DISCUSSED BELOW. YOU UNDERSTAND THAT BY THIS AGREEMENT YOU ARE GIVING UP THE RIGHT TO BRING A CLAIM IN COURT OR IN FRONT OF A JURY." *Id.* As to scope, it provides that the arbitration agreement covers "ANY DISPUTE THAT IN ANY WAY RELATES TO OR ARISES OUT OF THIS AGREEMENT." *Id.* at 7.

The third paragraph of the arbitration provision states that "**THIS AGREEMENT DOESN'T ALLOW CLASS OR COLLECTIVE ARBITRATIONS**." *Id.* The last paragraph of the agreement further provides that "**IF FOR ANY REASON A CLAIM PROCEEDS IN**

**COURT RATHER THAN THROUGH ARBITRATION . . . NO ACTION WILL BE BROUGHT ON A CLASS OR COLLECTIVE BASIS.**" *Id.* at 9.

* * *

Each of the Carriers' subscriber agreements specified that the agreement and the arbitration clause contained therein would be governed by the Federal Arbitration Act and the law of the state encompassing the billing address associated with each subscriber's Verizon account. Dkt. 70-8 at 3, 9 (AT&T); Dkt. 70-18 at 8 (T-Mobile); Dkt. 70-27 at 7, 9 (Verizon Wireless). The billing address associated with each Individual Plaintiffs' account is in Florida. Dkt. 70-1 at 3 (Phillips Decl. ¶ 12) (Leon); Dkt. 70-9 at 5 (Sanchez Decl. ¶ 30) (M. Inza); Dkt. 70-26 at 2–3 (Ninete Decl. ¶¶ 5, 8) (R. Inza and Leon).

Plaintiffs oppose the motion to compel arbitration, but they do not dispute or otherwise controvert any of these facts. *See* Dkt. 76. Defendants' motion to compel is fully briefed and ripe for decision. *See* Dkts. 86, 94.

## II. LEGAL STANDARD

"Section 2 of the [FAA] makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). The FAA "reflect[s] both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *Id.* at 339 (internal citations and quotation marks omitted). "A motion to compel arbitration is decided on a summary judgment standard." *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 998 F.3d 449, 456 (D.C. Cir. 2021).

"Because the party seeking to enforce an arbitration agreement bears the burden of proving that the other party agreed to arbitrate, . . . the party seeking to compel arbitration must first present evidence sufficient to demonstrate an enforceable agreement to arbitrate." *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 9 (D.D.C. 2021) (internal citations, brackets, and quotation marks omitted). "The burden then shifts to the non-moving party to raise a genuine issue of material fact as to the making of the agreement, using evidence comparable to that identified in Rule 56." *Id.* (internal citations and quotation marks omitted). "The court must grant summary judgment with respect to the formation of an arbitration agreement if the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (internal citations and quotation marks omitted). But if the Court concludes that a "genuine dispute of material fact exists as to the making of the arbitration agreement, including whether the parties assented to the agreement," the case must "proceed summarily to trial solely on the issue of arbitrability." *Jin v. Parsons Corp.*, 966 F.3d 821, 827 (D.C. Cir. 2020) (internal quotations omitted).

## III. ANALYSIS

### A. Claim Splitting

Before turning to whether Individual Plaintiffs must arbitrate their claims, the Court first addresses Defendants' request that VoIP-Pal's claims be stayed or dismissed based on the prohibition on claim splitting. *See* Dkt. 70 at 43. The rule against claim splitting "oblig[ates] a plaintiff to 'assert all . . . causes of action arising from a common set of facts in one lawsuit.'" *Steele v. United States*, 144 F.4th 316, 324 (D.C. Cir. 2025) (citation omitted). The rule "'shield[s] parties from vexatious concurrent or duplicative litigation.'" *Id.* at 325 (quoting *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011)). A plaintiff impermissibly splits its claim when "the plaintiff seeks 'to maintain two actions on the same subject in the same court, against

the same defendant at the same time.'" *Clayton v. District of Columbia*, 36 F. Supp. 3d 91, 94 (D.D.C. 2014) (quoting *Katz*, 655 F.3d at 1217). Claim splitting "is a proper basis for dismissal under Rule 12(b)(6)." *Steele*, 144 F.4th at 325.

Plaintiffs do not respond to Defendants' contention that VoIP-Pal has impermissibly split its claims in their response brief or their surreply. *See* Dkts. 76, 86. The Court will therefore treat this argument as conceded. *See, e.g.*, *McMillan v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 64, 69 (D.D.C. 2012) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

The Court also independently concludes that VoIP-Pal has violated the prohibition on claim splitting. A subsequent lawsuit is barred by the prohibition on claim-splitting if there is a prior suit "(1) involving the same claims or cause of action, (2) between the same parties or their privies . . . (3) before a court of competent jurisdiction." *Steele*, 144 F.4th at 325 (citation modified). Before filing this suit, VoIP-Pal filed another suit, which is also pending before the undersigned, raising identical claims against the same defendants. *See VoIP-Pal.com, Inc. v. AT&T Inc.*, 24-cv-3051 (D.D.C. Oct. 25, 2024). Both suits allege that Defendants violated the antitrust laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Telecommunications Act by bundling Wi-Fi calling and cellular service, offering Wi-Fi calling at no additional cost to a qualifying cellular plan, and using VoIP-Pal's technology without a license. *Compare* Dkt. 10-4 at 22–23, 181–204 (2d Am. Compl. ¶¶ 25–29, 537–624), *with* Second Amended Complaint at 23–24, 168–84 (¶¶ 29–36, 556–637), *VoIP-Pal.com, Inc. v. AT&T Inc.*, 24-cv-3051 (D.D.C. Apr. 22, 2025), ECF No. 9-4. The class complaint itself alleges that "this Class Action and [] VoIP-Pal's parallel standalone antitrust action . . . are centered on

two coordinated and unlawful breaches by the Defendants." Dkt. 10-4 at 22 (2d Am. Compl. ¶ 25); *see also id.* (2d Am. Compl. ¶ 26). And in their response to Defendants' motion to compel arbitration, Plaintiffs assert that "VoIP-Pal's individual suit and the putative class action arise from the same operative facts and legal theories." Dkt. 76 at 38; *see Steele*, 144 F.4th at 326 (affirming dismissal of claims for claim-splitting where plaintiffs' "counsel conceded . . . that the two suits rest on the same operative facts and legal theories").

VoIP-Pal's decision to bring identical claims in two different suits before the same court presents the risk of "vexatious concurrent or duplicative litigation" addressed by the rule against claim splitting. *Steele*, 144 F.4th at 325. For that reason, and because none of the Plaintiffs have objected to VoIP-Pal's dismissal, the Court will dismiss VoIP-Pal from this suit and allow it to continue pressing its claims, to the extent they can be sustained, in its standalone suit. *Cf., e.g.*, *Hudson v. Am. Fed'n of Gov't Emps.*, 308 F. Supp. 3d 388, 394 (D.D.C. 2018) (dismissing claims for improper claim splitting); *Clayton v. D.C.*, 36 F. Supp. 3d 91, 95–96 (D.D.C. 2014) (same).

**B. Arbitration**

The FAA "places arbitration agreements on equal footing with other contracts, and requires courts to enforce them according to their terms." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). "Like other contracts, however, [arbitration agreements] may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Id.* at 68 (citation modified). Plaintiffs concede that they "have entered into valid arbitration agreements" and that "those agreements are written to cover all types of claims," including, presumably, the ones asserted in this case. Dkt. 94 at 3. They nonetheless raise a bevy of challenges to the enforceability of their arbitration agreements. Although the Court would ordinarily have to

decide whether Plaintiffs have a valid arbitration agreement with each Defendant, *see Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003), it need not do so here for two reasons.

First, the Court cannot consider Plaintiffs' challenges to the enforceability of T-Mobile's and Verizon's subscriber agreements because they both contain a delegation clause giving the arbitrator authority to decide the gateway issue of arbitrability. Dkt. 70-18 at 7–8 (T-Mobile subscriber contract providing that the "arbitrator will have the power to rule on . . . any issues concerning the existence, validity, or scope of either this Agreement or the arbitration clause"); Dkt. 70-27 at 7 (Verizon subscriber contract providing that the arbitrator "shall have exclusive authority to arbitrate . . . any dispute regarding the validity, enforceability or scope of any portion of this agreement (including the agreement to arbitrate)" (capitalization normalized)). The FAA requires courts to enforce delegation provisions and to leave "any challenge to the validity of the Agreement as a whole for the arbitrator" unless the party opposing arbitration "challenge[s] the delegation provision specifically." *Rent-A-Ctr.*, 561 U.S. at 72 (leaving unconscionability challenge to arbitrator); *accord Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). Because Plaintiffs never mention or challenge the delegation provisions of their arbitration agreements, they must raise their challenges to the enforceability of the Verizon and T-Mobile agreements in arbitration.

The Court also notes that T-Mobile's and Verizon's arbitration agreements contain language covering disputes with their officers and directors. Dkt. 70-18 at 6 (T-Mobile's arbitration agreement "includes any claims against other parties relating to Services, Products, or Devices provided or billed to you . . . whenever you also assert claims against us in the same proceeding"); Dkt. 70-27 at 7 (Verizon's arbitration agreement covers "any disputes you have with our employees or agents"). Florida law also allows the "officers and directors of [a]

corporation" to invoke an arbitration clause signed by the corporation where "the claims against them arose solely in connection with their activities as officers and directors of that corporation." *Ocwen Fin. Corp. v. Holman*, 769 So. 2d 481, 483 (Fla. Dist. Ct. App. 2000); *see also Tenet Healthcare Corp. v. Maharaj*, 787 So. 2d 241, 243 (Fla. Dist. Ct. App. 2001); *Shetty v. Palm Beach Radiation Oncology Assocs.-Sunderam K. Shetty, M.D., P.A.*, 915 So. 2d 1233, 1235 (Fla. Dist. Ct. App. 2005); *Fla. Roads Trucking, LLC v. Zion Jacksonville, LLC*, 384 So. 3d 817, 820 (Fla. Dist. Ct. App. 2024). T-Mobile and Verizon officers and directors may therefore invoke the arbitration agreements—and delegation clauses—of their respective employers.

Unlike the Verizon and T-Mobile agreements, the AT&T agreement provides that "only a court can decide . . . issues relating to the scope and enforceability of the arbitration provision." Dkt. 70-8 at 4. The Court need not determine whether the AT&T agreement is enforceable, however, because each Individual Plaintiff is bound by either Verizon's or T-Mobile's agreement and is estopped from litigating their separate claims against any of the other Defendants. When asked to enforce an arbitration agreement covered by the FAA, federal courts apply "background principles of state contract law," including "doctrines that authorize the enforcement of a contract by a nonsignatory." *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 437 (2020) (citation modified). The Supreme Court has specifically recognized that "the FAA permits a nonsignatory to rely on state-law equitable estoppel doctrines to enforce an arbitration agreement." *Id.* at 438; *accord Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631–32 (2009).

Equitable estoppel is an exception to the ordinary rule that "a party cannot compel arbitration under an arbitration agreement to which it was not a party." *Beck Auto Sales, Inc. v. Asbury Jax Ford, LLC*, 249 So. 3d 765, 767 (Fla. Dist. Ct. App. 2018); *see also Marcus v. Fla.*

*Bagels, LLC*, 112 So. 3d 631, 633–34 (Fla. Dist. Ct. App. 2013). "The linchpin of equitable estoppel is fairness." *Bergeron Env't & Recycling, LLC v. LGL Recycling, LLC*, 398 So. 3d 988, 995 (Fla. Dist. Ct. App. 2024). Florida courts have applied equitable estoppel to compel arbitration where "a signatory to a contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both a non-signatory and one or more of the signatories to the agreement." *Kratos Invs. LLC v. ABS Healthcare Servs., LLC*, 319 So. 3d 97, 101 (Fla. Dist. Ct. App. 2021); *see also Fla. Roads Trucking*, 384 So. 3d at 820. However, equitable estoppel "does not 'expand the scope of disputes subject to arbitration.'" *Id*. Accordingly, equitable estoppel will not permit non-signatories to invoke an arbitration clause that limits its application to disputes between the parties of the arbitration agreement. *Id.*; *see also Kratos Invs.*, 319 So. 3d at 101–02; *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 845 F.3d 1351, 1354–55 (11th Cir. 2017).

Applying these principles here, the Court concludes that Plaintiffs must arbitrate their claims against all the Defendants. Both T-Mobile's and Verizon's arbitration agreements, which cover all three Individual Plaintiffs, contain the kind of broad language sufficient to evince an intent to arbitrate claims with nonsignatories. *See Kratos Invs*., 319 So. 3d at 102 ("[A]rbitration provisions containing the language, 'arising out of or related to,' in certain instances can be construed to include non-signatories." (citation modified)). Under T-Mobile's arbitration agreement, subscribers agree to arbitrate "any and all claims or disputes, of any nature, including tort and statutory claims, in any way related to or concerning the agreement." Dkt. 70-18 at 6. Verizon's arbitration agreement contains similar language, requiring subscribers to arbitrate "any dispute that in any way relates to or arises out of this agreement." Dkt. 70-27 at 7. These agreements do not "expressly restrict[] arbitration to the signing parties," *Koechli v. BIP Int'l,*

*Inc.*, 870 So. 2d 940, 945 (Fla. Dist. Ct. App. 2004), and are therefore amenable to enforcement by non-signatories. That conclusion is reinforced by the substance of Plaintiffs' allegations and request for relief. Plaintiffs maintain that (1) Defendants are overcharging them, since they should be able to purchase standalone Wi-Fi calling for pennies on the dollar; (2) Defendants are lying to them by calling Wi-Fi calling free with the purchase of qualifying cellular plans; and (3) Defendants are unlawfully tying Wi-Fi calling and cellular calling, *see, e.g.*, Dkt. 10-4 at 100, 112, 134–35 (2d Am. Compl. ¶¶ 275, 318, 392)—all allegations which arise from or relate to their subscriber agreements with T-Mobile and Verizon. And Plaintiffs request remedies that would require the Court to either rewrite their subscriber agreements or award damages in compensation for Defendants charging too much under the agreements. *See id.* at 215–220 (2d Am. Compl. ¶¶ 654–86).

Plaintiffs' claims, moreover, rely on allegations of precisely the sort of "substantially interdependent and concerted misconduct" that justifies equitable estoppel. *Fla. Roads Trucking*, 384 So. 3d at 819 (citation modified). The crux of Plaintiffs' claims under the antitrust laws and under RICO is that "AT&T, Verizon, and T-Mobile acted not as rivals, but as a single enterprise . . . engaging in coordinated conduct" to dominate the market for Wi-Fi calling. Dkt. 10-4 at 20 (2d Am. Compl. ¶ 19); *see, e.g.*, *id.* at 22 (2d Am. Compl. ¶ 24) ("At the factual core of this Complaint is a nationwide tying scheme, executed under *one unified enterprise across three brands* . . . ." (emphasis added)); *id.* at 33 (2d Am. Compl. ¶ 62) ("This complaint brings forth *a single, unified act of enterprise fraud* . . . ." (emphasis added)); *id.* at 54 (2d Am. Compl. ¶ 124) ("AT&T, Verizon, and T-Mobile . . . operat[ed] *collectively as a unified RICO enterprise*." (emphasis added)). The complaint is rife with allegations of conspiracy and "coordinated" misconduct. *E.g.*, Dkt. 10-4 at 10–11, 13, 15, 17, 20, 25, 33, 43, 54, 60, 115, 182–

83, 187, 196–97, 199–200, 207–08 (2d Am. Compl. ¶¶ 1–2, 4, 8, 11, 15, 19, 33, 62, 85, 126, 143, 328, 540–41, 558, 600–03, 607, 610, 633). Furthermore, the vast majority of Plaintiffs' allegations do not differentiate among Defendants. *See, e.g.*, *id.* at 13, 20, 26, 34, 43–44, 60, 68, 183, 195 (2d Am. Compl. ¶¶ 8, 20, 35, 63–64, 84, 88, 143, 164, 541, 596).

Because Plaintiffs' claims against all of the Defendants are "based on the same set of operative facts" and allegations of conspiracy, coordinated misconduct, and "enterprise fraud," *e.g.*, *id.* at 176 (2d Am. Compl. ¶ 176), equitable estoppel is warranted. *Kratos Invs*., 319 So. 3d at 101 (applying equitable estoppel where signatory "specifically allege[d] the appellants conspired with its agents in a scheme to steal ICD's business by interfering with and causing the agents to breach"); *Greene v. Johnson*, 276 So. 3d 527, 531 (Fla. Dist. Ct. App. 2019) (applying equitable estoppel where plaintiff's claims against non-signatory defendants were "based on the same set of operative facts that Greene alleges against signatory Johnson, that is, a conspiracy by the defendants"); *Lash & Goldberg LLP v. Clarke*, 88 So. 3d 426, 427 (Fla. Dist. Ct. App. 2012) (applying equitable estoppel where complaint alleged that defendants "intentionally 'engaged in a pattern of fraud and deceit" and "conspired to prevent" plaintiff from discovering information); *Citi Cars, Inc. v. Cox Enters., Inc.*, No. 1:17-CV-22190-KMM, 2018 WL 1521770, at *11 (S.D. Fla. Jan. 22, 2018) (equitable estoppel warranted where "Plaintiff essentially alleges that Defendants have acted in concert by entering into a conspiracy to restrain trade and force Plaintiff into bankruptcy"); *Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1402–03 (S.D. Fla. 2014) (equitable estoppel warranted where plaintiff alleged that defendants conspired to engage in illegal lending activities); *Maldonado v. Mattress Firm, Inc.*, No. 8:13-CV-292-T-33AEP, 2013 WL 2407086, at *5 (M.D. Fla. June 3, 2013) (equitable estoppel warranted where complaint "fail[ed] to distinguish between the actions of the Defendants"); *Escobal v.*

*Celebration Cruise Operator, Inc.*, No. 11-21791-CV, 2011 WL 13175628, at *3 (S.D. Fla. June 23, 2011) (equitable estoppel warranted where plaintiff's "claims against both Defendants rely on a single set of factual allegations" and where complaint "makes various allegations regarding 'Defendant' without specifying to which Defendant he refers").

For clarity's sake, the Court notes that the foregoing analysis also requires Plaintiffs to arbitrate their claims against Individual Defendants, the officers and directors of each carrier. Plaintiffs do not allege any specific facts about any Individual Defendant other than his or her status as an officer or director. They merely allege that the "executives and directors" "oversaw," "adopted," and "approved" their carriers' decisions to offer Wi-Fi calling for free with the purchase of qualifying cellular plan. Dkt. 10-4 at 106–08 (2d Am. Compl. ¶¶ 292–300). And because Individual Defendants purportedly "orchestrated and approved [the] enterprise-wide fraud," Plaintiffs argue the Court should "pierce[] the corporate veil" and prevent Individual Defendants from "claim[ing] the protections of corporate separateness." Dkt. 10-4 at 106, 108 (2d Am. Compl. ¶¶ 298, 300). Plaintiffs cannot have it both ways. They cannot allege that Individual Defendants orchestrated the conspiracy and racketeering activity they have attributed to the Carrier Defendants and ask the Court to take the extraordinary step of treating Individual Defendants as alter egos of the Carrier Defendants, while also avoiding arbitration with those Individual Defendants. That would work precisely the sort of unfairness that the equitable estoppel doctrine seeks to avoid. Because Plaintiffs' claims against Individual Defendants are derived from the same factual allegations as their claims against Carrier Defendants, Plaintiffs must arbitrate their claims against Individual Defendants. *See, e.g.*, *Flores v. Antibiotic Adjuvant, Inc.*, No. 1:20CV170, 2020 WL 10727984, at *5 (N.D. Fla. Sept. 15, 2020).

Plaintiffs' arguments against the application of collateral estoppel are unpersuasive. They first suggest that equitable estoppel is appropriate only when a signatory's "claims relate directly to the contract and the signatory is relying on the contract to assert its claims against the non-signatory." Dkt. 76 at 37 (quoting *AP Atlantic, Inc. v. Silver Creek St. Augustine, LLLP*, 266 So. 3d 865, 866 (Fla. Dist. Ct. App. 2019)). But that is merely one of the two independent grounds for equitable estoppel recognized by Florida courts. Non-signatories may rely upon either the signatory's allegations of interdependent and concerted misconduct *or* the signatory's invocation of the contract as the basis for their claims against the non-signatory, but they need not invoke both theories to justify the application of equitable estoppel. *See, e.g.*, *Fla. Roads Trucking*, 384 So. 3d at 820 (setting out the "two situations" in which Florida courts apply equitable estoppel); *Koechli*, 870 So. 2d at 944 (same).

Plaintiffs also argue that "[t]here is no legal basis for non-signatories to compel arbitration of RICO, Sherman Act § 2, or Telecommunications Act claims rooted in public rights and enterprise fraud." Dkt. 76 at 38. But they do not identify any federal or Florida case law holding that non-signatories may not rely on equitable estoppel principles to compel the arbitration of statutory claims, and other federal courts have applied equitable estoppel to both RICO and Sherman Act claims. *See Citi Cars*, 2018 WL 1521770, at *11 (Sherman Act claims); *Gunson v. BMO Harris Bank*, 43 F. Supp. 3d 1396, 1402–03 (S.D. Fla. 2014) (RICO claims). To the extent that Plaintiffs mean to argue that their statutory claims fall outside the scope of T-Mobile's and Verizon's arbitration agreements, they must address those arguments to the arbitrator pursuant to the delegation clauses in those agreements. *See Henry Schein*, 586 U.S. at 71.

In sum, Plaintiffs do not dispute that they voluntarily agreed to arbitrate the claims raised in this case. They argue only that "legal constraints external to the parties' agreement foreclose[] the arbitration of those claims." Dkt. 94 at 2. But because T-Mobile's and Verizon's arbitration agreements contain delegation clauses, M. Inza, R. Inza, and Leon must challenge their arbitration agreements with those carriers in arbitration. Under Florida's law of equitable estoppel, any Carrier or Individual Defendant may invoke T-Mobile's or Verizon's arbitration agreement. Because all of Plaintiffs' claims are subject to arbitration, and Defendants have requested a stay pending arbitration, Dkt. 70 at 10, "§ 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see* 9 U.S.C. § 3.

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration and stay proceedings, Dkt. 70, is hereby **GRANTED**, and VoIP-Pal is hereby **DISMISSED** as a Plaintiff in this action.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 18, 2026